And we'll move now to our eighth case this morning, which is Rivas-Pena v. Sessions. Good morning, Your Honors. May I please the Court? This case comes before the Court in the context of deferral of removal under the Convention Against Torture, the CAS. And that form of relief is meant to protect a person from being sent back to a place where they're likely going to suffer torture or death, and that's it. It's a mandatory form of relief, not a discretionary one. And so when there's a sufficient risk, it must be granted without looking at the person's prior criminal history or one's own views of whether the person is sympathetic or not. The facts underlying the claim are pretty straightforward. So, essentially, Rivas-Pena generated a loss of at least half a million dollars for the CEDAs per tell. And a very high-ranking member of the CEDAs told him, you're going to be held accountable for that. And so Rivas-Pena, the petitioner, now very reasonably fears that, as this very high-ranking member of the CEDAs, Strata, told him, if he goes back to Mexico, he'll be held accountable for it, which the CEDAs does by inflicting brutal torture and death. And so there are parts of the record that I want to highlight. It's an extensive record, and I want to make sure it doesn't get lost. So lower-level members of the CEDAs, Administrative Record 370, which they call the CEDA watches, received a harsher treatment. When they fail to perform, the CEDAs will take the lives of these undisciplined punks, simply, impossibly, by hanging them from a bridge. What document are you referring to there? Who's speaking? Professor Grayson, an expert in the CEDAs' grutale. It's an excerpt from his book. Oh, the book. Okay. So you're not referring to Dr. Jones, the specific expert who analyzed that? This is Professor Grayson, the book. And going down, even in that same page, they say the members, they will have to pay the executioner, which is the CEDAs, any losses sustained on their watch. So the several errors made by the agency, starting with the IJ, is they're holding that petitioner's claim was entirely speculation, pure speculation, they said. And the Board of Immigration Appeals said, well, there's nothing wrong with that analysis. We'll affirm it. We agree with it. We affirm it. And that's because in their estimation, because petitioner had not yet been tortured or killed by the CEDAs, it was all speculation. And therefore, he could never sustain a claim for cat. Well, that argument may sweep a little too broadly. I thought they were arguing also there had not been an explicit threat. There hadn't been, as we've seen in other cases, for example, visits and threats to family members and so on, right? So they do say there hasn't been context since 2013, which is when the facts arising gave rise, which is his arrest. But the problem with that is what I call penalizing the petitioner for what is a factual impossibility or unreasonable. Is he still in custody? He's still in custody today. He has not been freed at all. He was released to ICE from prison to ICE. He was transferred to ICE. To ICE detention. And so penalizing someone for what is factually impossible for them to prove, not because it couldn't necessarily happen, but because the circumstances that would make it possible for it to happen do not exist. So, yeah, they say, well, you know, in some other cases, relatives of people that the CEDAs want to harm had been harmed. Yeah, maybe, but my client doesn't have those relatives in Mexico, so it's impossible for them to require him to show, oh, yeah, my relative in Mexico has been harmed, but he doesn't have such relatives. So that's why it's important to look at the regulation with its mandate. The mandate is to assess a future risk, whether the risk is present. And so it gives a multifaceted approach for that risk. It never requires that one fact must be proven because it actually tells you the circumstances of each case. And the difficulty here with the IJ's opinion, as I see it, is that the expert, Dr. Jones, gave a very specific and detailed risk assessment in accordance with the regulations. When I read the opinion, the only reference to the expert's testimony is that, you know, he's accepted as an expert based on the proffer. And the IJ says even though he gave ample information regarding conditions in Mexico, the claim is purely speculative. So when I went to read the opinion, I thought he's just giving a statement of general conditions in Mexico regarding the Zetas, and he didn't actually apply it to this applicant. But there's a whole section, a robust section in this opinion, where he actually applies the general conditions that he referred to in depth earlier to this applicant's specific factual situation. So there's just those two things cannot be reconciled. Correct, Your Honor, and it's not only does he talk about the Zetas, what they do as a matter of pattern and practice, not only about the characteristics that will subject the petitioner to harm. He also talks about, he gives examples of similarly situated individuals, and he talks about things, for example, their background checks, methodologies, their pickups. So some of the statements that you perhaps hear by the government, oh, well, they might not look at his record or his sentencing. He goes into detail talking about how this is a military, an organization created with military intelligence and counterintelligence notions at a base. So while they're grotesque and brutal, they do that with a very specific intent. So we're not talking about people that can't conduct research. The way the organization is formed is to conduct counterintelligence, to conduct background checks on people that they care about. And so the explanation is extremely compelling about the circumstances of this case. Something that strikes me, and I was just thinking from the logical or human nature perspective, if anyone were to, if we were to think that someone owes us half a million dollars to a million dollars, that's not something that one would ever forget, in all honesty. And so the expert explains, even the DEA has acknowledged, that the price to send a hitman to torture and kill someone or recover is about 100 bucks in Mexico. Obviously, the state does have thousands of them, but that's how much he'll cost them. So from the human nature perspective, well, since we're not criminal actors, we might define what we do to the person we think owes us that much money. Would we invest 100 bucks in trying to recover half a million or getting back at the person we think has wronged us in that way? I think the logical answer from even the natural perspective and based on the evidence is yes. Counsel, I want to focus in on the connections between the Zetas and the petitioner, because part of what we're struggling with is the general versus the particular. And as I understand it, you've got Mr. Estrada's connection to the Zetas. He's been a fugitive since July of 13, correct? Correct. Then you've got Mr. Estrada's statement where petitioner realizes the toolbox are full of contraband. He ends up building the separate room. And the statement is that Mr. Rivas-Pena could no longer leave the organization, whether it be Estrada's organization. And then otherwise he was responsible for what might happen to the contraband, meaning Mr. Rivas-Pena was. Correct. Then you've got what happened to this common friend, maybe even the same middle school in Mexico. The three of them, correct. And that was in 2009, two years before they reconnected. Correct. Is that a correct understanding as to what the connections are between Mr. Rivas-Pena and the Zetas? Yes, it may, in spite of my time expiring. So that was the very concerning point here. We have a very high-level Zeta, someone who has power and control within the organization from the organizational standpoint, not just a minor actor within the Zetas. How do we know that about Mr. Estrada? We know that about Mr. Estrada not because we're telling that to the court, but because the DA says so, the FBI says so, the DOJ says so, and so that evidence was furnished to the immigration court, and obviously it's now part of the administrative record. So this individual knows Mr. Rivas-Pena from childhood. They attended the same middle school. Efrain also attended the same middle school. The three of them were classmates. And so we know, and he's ultimately the person that Mr. Rivas-Pena unfortunately dealt with directly with Estrada, and so the thread doesn't come from a low-level Zeta. It comes from essentially someone who manages the organization at a large level and who knows Mr. Rivas-Pena very deeply. So we're not running into a problem like maybe in the Wenguru case where maybe some geeky might recognize Wenguru if he goes back, although there was still definitely a very real threat for Wenguru as a court help. Here, it's the organization at the highest echelon knows about my client. They know him well. They know him from childhood. They know where he grew up. They know where he lived. And so we also know what happens to a similarly situated individual like Efrain who was dealing with Estrada, who was busted with drugs, got a favorable deal. Two weeks after he got removed, he was knifed to death. Not only knifed to death, mind you, the knife wounds essentially severed his head off of his body. So how could someone say that that is speculation at all and not based in fact? It's clearly not supported by the record, but more importantly, you don't even get to that question here because there's just no logical bridge between the conclusions the judge drew and the record or even the claim as presented, and I think that's a problem. There was an unwillingness to analyze the claim as presented. All right. Thank you. Ms. Singer. Good morning, Your Honors. To meet it pleases the court, my name is Jennifer Singer, and I represent the United States Attorney General, the respondent in this matter. This case boils down to the question of whether petitioner's evidence shows that he himself will be singled out for torture by the Zetas, and the answer to that question in the government's estimation is no, that is not the case, and it's not the case for two reasons. First of all, the petitioner's evidence does not show that he is in the class of people who the Zetas target for torture. He claims that he will be tortured because he will be viewed as a debtor, but if you read all the country conditions evidence, it reflects that debtors are people who rip off loads of drugs, skim drugs off the top, skim money off the top, people who have stolen from the Zetas, people who pocket money, people who are loaned money to sell drugs for resale, or there was one instance where someone was given a loan to start a business. That wasn't the basis of either the IJs or the BIA's opinion. The reason the claim was rejected was because it was speculative, and that's what the BIA affirmed. So we're limited to the basis on which the agency decided the case, and that basis cannot stand in the face of this very detailed expert report that was handled in an extremely dismissive way. There's just no way to reconcile the detailed analysis of this applicant's significant factual risk. I mean, there was a personalized risk assessment that this expert performed and opined about, and his report was accepted. It wasn't rejected. It wasn't deemed not an expert. I mean, it's in the record, and it's dismissed as speculative. Those two things just can't be reconciled. I respectfully disagree. I do agree that the BIA and immigration judge said it was a speculative claim, but looking at the beginning of the board's decision, it talks about generalized evidence of torture is insufficient to establish a claim. This isn't generalized evidence. This is a specific risk assessment analyzing this applicant's personal situation, the personal facts of his case and his claim, and making a specific risk assessment based on what this expert witness knows about the conditions on the ground and the operation of this organized criminal enterprise. Again, I respectfully disagree because absent individualized evidence of a specific risk to the petitioner, it's generalized evidence, and that's what makes the claim speculative. And I agree that the expert witness report came in without issue, but reading the entire expert witness report, the only specific instances that Nathan Jones points out is that he says certain debtors, such as those who have floating debts or rip off loads of drugs, may be disciplined or killed, and that's the administrative record at 497, or they're killed if they do something that they're not supposed to do, or they are tortured if someone is stolen from them, and that's at 498, and also that they punish snitches, and that's at 497. But petitioner is not in those class of people. He has not ripped off a load of drugs. He doesn't have a floating debt, and he's not an informant. So even though Nathan Jones, the expert, did proffer his opinion, the evidence he cites to for the basis of that opinion does not fit Mr. Rivas-Pena's specific circumstances. Jones says he looks like a snitch, right? He's going to look like a snitch when the Zetas look into his background. That's his opinion, that he would be perceived as a snitch, but his only evidence is that actual snitches are, and the board's finding was that it was. So suspected snitches get due process from the Zetas? He does not. His opinion is that he would be viewed as a snitch, but there's no basis to think that he would be viewed as a snitch. He points to the Department of Corrections online report, and he says that if you look at it, it looks like he was paroled the same date he was sentenced. But if you actually look at it, and I have it right here at 302, that same Department of Corrections online printout shows that a custody date of February 2012 and a release date of March 2017. So that would reflect 5 years incarceration, and it also shows an 8-year sentence. So 5 years on an 8-year sentence to me is a significant amount of time and would not make the Zetas member perceive that he was a snitch. And I think the information that Jones relied on just took out two sentences from this printout rather than looking at the whole thing in its entirety. The agency didn't do any of this analysis that you're sketching here. The agency just said this claim is speculative, end of story. Did not engage with the expert's report at all. It did mention it, but it didn't go into all the analysis I am, but I think that is subsumed in the agency's decision because generalized evidence is generalized absent a specific risk to the individual, and I think that's what the board was trying to suggest here. Again, petitioner's just not in the class of persons who the Zetas target for harm. He hasn't skimmed off drugs. He hasn't stolen money. Well, Dr. Jones says he is and explains why in great detail, and neither the board nor the IJ engaged with that. Again, Dr. Jones, his specific instances that he uses to support his opinion are not petitioner's circumstances. If the court disagrees about the board's or the immigration judge's analysis... If there were that kind of analysis in this agency opinion, maybe your argument would carry the day, but there isn't any analysis other than the statement that this is a speculative claim. Again, I... That's some total of the analysis. Agreed, but a claim is speculative when it's not based upon evidence, and here there's not evidence that places petitioner in the category of people who are targeted for harm by the Zetas, and that's what makes his claim speculative. If the court were to disagree with that, I would also... If they were going to remand the case for further analysis, I would also ask that the acquiescence issue be addressed because the IJ and the board did not address that, and that's also an aspect that would benefit from the board's opinion in the first instance. Other than that, if there's... If we... If Mr. Rivas-Pena is entitled to relief under the Convention Against Torture, what happens to him? He might remain in detention. Indefinitely. He could be released. I think it depends upon whether he would be determined to be a threat to the community, but he either would remain in detention or be released until the government... I'd rather stay in federal detention indefinitely than be returned to Mexico, right? I don't want to opine on that because he could be released. Okay. And that was his only choice. This is the only possible relief that exists. Exactly. Cat deferral is his only option for relief from removal. If there's no further questions, the government rests on its briefs. Thank you. Yes, Ms. Espinoza, your time had run out, but we kept you at the podium with questions, so you can have a minute for rebuttal. Thank you. I just want to clear up something factually that is very important. As I say in my brief, the online record, the IDOC record, does have a mistake of when he was arrested. That makes it so much worse for him because the date is February 2012. He met with Estrada July 2013. So Estrada knows that he wasn't in prison, which makes it seem even more like a snitch because that's exactly what happens. You get busted by the police, you get let out, cooperating with the police to gather information. So that alone, that mistake, makes it even the more likely that the SEDAS will construe it that he was being a snitch. And that's publicly accessible. And Estrada is the one who met with him July 2013. So that alone is not only indicia that he's a snitch for the SEDAS. That is a dead sentence. And like Dr. Jones, not only his opinion, but citing this very large volume of other experts and analysis and data, one of which is a main writer, says that is enough to get you killed on the spot just because that is the one thing that even the indicia will get you killed. The use of the word speculation is very troubling because the CAD requires a prediction for the future. And so by its very nature, we need to predict what will happen in the future, speculate. But that cannot be detrimental because that's a test. We need to predict it. And finally, the acquiescence issue, they could have moved for remand if they wanted to. They failed to do that. Acquiescence was not addressed because they did not believe it was an issue at all. Definitely not in this record. It would not be an issue. They did not believe that was something detrimental to the claim. It was all about whether it was speculation or whether he'd been tortured. And so for those reasons, not only have we surpassed the standard of proof, but he's proved the risk is very real to him. Thank you. All right, thank you. Our thanks to both counsel. The case is taken under advisement.